# United States District Court, Northern District of Illinois

| Name of Assigned Judge or Magistrate Judge | DAVID H. COAR | Sitting Judge if Other than Assigned Judge | |
|---|---|---|---|
| **CASE NUMBER** | 02 C 1590 | **DATE** | 9/11/03 |
| **CASE TITLE** | Ronald Myers (#N-30973) vs. Dr. James McAuley, et al. | | |

**MOTION:**

[In the following box (a) indicate the party filing the motion, e.g., plaintiff, defendant, 3rd party plaintiff, and (b) state briefly the nature of the motion being presented.]

**DOCKET ENTRY:**

(1) ☐ Filed motion of [ use listing in "Motion" box above.]

(2) ☐ Brief in support of motion due _____.

(3) ☐ Answer brief to motion due_____. Reply to answer brief due _____.

(4) ☐ Ruling/Hearing on __ ____ set for _____ at __ _____.

(5) ☐ Status hearing[held/continued to] [set for/re-set for] on _____ set for _____ at _____.

(6) ☐ Pretrial conference[held/continued to] [set for/re-set for] on _____ set for _____ at __ ____.

(7) ☐ Trial[set for/re-set for] on _____ at _____.

(8) ☐ [Bench/Jury trial] [Hearing] held/continued to __ ____ at _____.

(9) ☐ This case is dismissed [with/without] prejudice and without costs[by/agreement/pursuant to]
☐ FRCP4(m) ☐ General Rule 21 ☐ FRCP41(a)(1) ☐ FRCP41(a)(2).

(10) ■ [Other docket entry] For the reasons set forth in the accompanying Memorandum Opinion and Order, the defendants' motion for summary judgment [#52] is granted. The clerk of the court is directed to enter judgment in favor of the defendants pursuant to Fed. R. Civ. P. 56. The case is terminated. The parties are to bear their own costs.

(11) ■ [See attached Memorandum Opinion and Order.]

| | | number of notices | | Document Number |
|---|---|---|---|---|
| | No notices required, advised in open court. | | | |
| | No notices required. | | | |
| | Notices mailed by judge's staff. | | | |
| | Notified counsel by telephone. | 9/16/03 date docketed | | |
| ✓ | Docketing to mail notices. | | | 63 |
| ✓ | Mail AO 450 form. | docketing deputy initials | | |
| | Copy to judge/magistrate judge. | | | |
| mjm | courtroom deputy's initials | date mailed notice | | |
| | | Date/time received in central Clerk's Office | mailing deputy initials | |

# IN THE UNITED STATES DISTRICT COURT
## FOR THE NORTHERN DISTRICT OF ILLINOIS
### EASTERN DIVISION



RONALD MYERS, #N-30973 )
)
      Plaintiff, )
)
      v. )    NO. 02 C 1590
)
DR. JAMES McAULEY, et al. )    HON. DAVID H. COAR
)
      Defendants. )

## MEMORANDUM OPINION AND ORDER

The plaintiff, currently a state prisoner, has brought this *pro se* civil rights action pursuant

to 42 U.S.C. § 1983. The plaintiff claims that the defendants, health care providers at the Cook

County Jail, violated the plaintiff's constitutional rights by acting with deliberate indifference to

his serious medical needs. More specifically, the plaintiff alleges that the defendants refused to

provide proper maintenance and medical care for his tracheotomy/breathing tube. This matter is

before the court for consideration of the defendants' motion for summary judgment. For the

reasons stated in this order, the motion will be granted.

Summary judgment "shall be rendered forthwith if the pleadings, depositions, answers to

interrogatories, and admissions on file, together with affidavits, if any, show that there is no

genuine issue as to any material fact and that the moving party is entitled to a judgment as a

matter of law." Fed. R. Civ. P. 56(c); *Celotex Corp. v. Catrett*, 477 U.S. 317, 322 (1986); *Prime*

*Northgate Plaza Ltd. Partnership v. Lifecare Acquisitions Corp.*, 985 F. Supp. 815, 817 (N.D. Ill.

1997). In determining whether factual issues exist, the court must view all the evidence and draw

all reasonable inferences in the light most favorable to the non-moving party. *Walker v.*

*Northeast Regional Commuter Railroad Corp.*, 225 F.3d 895, 897 (7th Cir. 2000).

However, Rule 56(c) "mandates the entry of summary judgment, after adequate time for discovery and upon motion, against a party who fails to make a showing sufficient to establish the existence of an element essential to that party's case, and on which that party will bear the burden of proof at trial." *Celotex*, 477 U.S. at 322. "Where the record taken as a whole could not lead a rational trier of fact to find for the non-moving party, there is no 'genuine issue for trial.'" *Chiaramonte v. Fashion Bed Group, Inc.*, 129 F.3d 391, 393 (7th Cir. 1997), *cert. denied*, 523 U.S. 1118 (1998).

## FACTS

The defendants have filed a statement of uncontested material facts pursuant to Local Rule 56.1. Together with their motion, the defendants served on the plaintiff the required notice under Local Rule 56.2, advising him what he needed to do to contest the motion, and specifically what he needed to do to dispute their statement of uncontested facts. In addition, the court's Minute Order of July 10, 2003, struck the plaintiff's original statement of contested facts and instructed him how to respond, reminding him that every assertion of fact he made had to be supported by a citation to the record. Despite this, many of the plaintiff's denials are unsupported by the evidence to which he points. Unsupported statements in a brief are not evidence and cannot be given any weight. *See, e.g., Johnson v. Spiegel, Inc.*, No. 02 C 0680, 2002 WL 1880137, at *4 (N.D. Ill. Aug. 15, 2002) (Pallmeyer, J.), *citing In the Matter of Morris Paint and Varnish Co.*, 773 F.2d 130, 134 (7th Cir. 1985). Furthermore, the plaintiff has failed to provide his own statement of additional facts he wishes the court to consider.

The plaintiff's failure to properly respond to the defendants' statements of material facts as directed warrants disregard of any contrary assertions he makes in his briefs. *See Smith v.*

2

*Lamz*, 321 F.3d 680, 683 (7th Cir. 2003). The court is not required to "wade through improper denials and legal argument in search of a genuinely disputed fact." *Id., citing Bordelon v. Chicago School Reform Bd. of Trustees*, 233 F.3d 524, 529 (7th Cir. 2000). And a mere disagreement with the movant's asserted facts is inadequate if made without reference to specific supporting material. *Edward E. Gillen Co. v. City of Lake Forest*, 3 F.3d 192, 196 (7th Cir. 1993).

Nevertheless, because the plaintiff is proceeding *pro se*, the court has considered the factual assertions he makes in his brief and affidavit, but only to the extent that the plaintiff could properly testify about the matters asserted at trial. Affidavits must concern facts about which the affiant is competent to testify, must be based on personal knowledge, and must set forth such facts as would be admissible in evidence. Fed. R. Civ. P. 56(e). A witness may not testify to a matter unless evidence is introduced sufficient to support a finding that the witness has personal knowledge of the matter. Fed. R. Evid. 602. It should additionally be noted that the validity of medical records and entries in the medical records cannot be disputed in the absence of any contrary evidence. *Moss v. Morman*, No. 99 C 3571, 2001 WL 1491183, at *4 (N.D. Ill. Nov. 26, 2001) (Andersen, J.)

The court therefore finds that the following facts are undisputed for purposes of this motion [or there is no genuine issue as to these facts]: The plaintiff, Ronald Myers, is a state prisoner. (Defendants' Exhibit A, Deposition of Plaintiff Ronald Myers, at p. 6.) At the time of the events giving rise to this action, the plaintiff was an inmate at the Cook County Jail. (Amended Complaint, p. 2, Part I, "Plaintiff(s)" section.)

The defendant James McAuley is the jail's Medical Director. (*Id.*, Part II, "Defendant(s)" section, pp. 2-2A.) The defendants Andrew Ting and Mohammed Mansour are staff physicians at

the jail. (*Id.*) The defendant Carlos Altez is a physician's assistant at the jail. (Defendants' Answer, ¶ 10.)

In September 1999, the plaintiff had a tracheotomy or tracheostomy because of breathing problems and because one of his vocal cords was not working properly. (Plaintiff's Deposition, pp. 10, 13.) The surgery left the plaintiff with a stoma[1] in his neck. (*Id.*, p. 10.) A device consisting of a permanent tracheotomy tube attached by "fangs" was placed in the plaintiff's neck during the surgery. (*Id.*, pp. 10-12.) To keep the tracheotomy tube clean and free of fluid and other obstructions, the plaintiff regularly used a suctioning device as well as a "trach kit" (brush, wires, pipe cleaners, cotton swabs, and gauze). (*Id.*, pp. 14-15.)

On July 28, 2001, almost two years after the tracheotomy tube was implanted, the plaintiff was arrested for residential burglary and held at the Cook County Jail pending trial. (Amended Complaint, p. 6; Plaintiff's Deposition, p. 8.) The plaintiff was incarcerated at the jail from July 28, 2001, to May 20, 2002. (*Id.*)

Upon the plaintiff's arrival at the jail, a physician performed an initial medical screening in the receiving unit. (*Id.*, pp. 8-9; Defendants' Exhibit B, Medical Records, pp. 1-4, "Medical Intake Record and assessment forms.) Following the medical screening, the plaintiff was placed in Division 10, the segregation unit, overnight. (Plaintiff's Deposition, p. 16.)

The next day, the plaintiff was seen at Cermak Health Services Emergency room by Dr. Enoch Anaglate (not a defendant). (Plaintiff's Deposition, p. 18; Medical Records, pp. 5-7.) Anaglate noted that the plaintiff had a tracheotomy tube and complained of shortness of breath.

---

[1]A stoma is an artificial permanent opening made in surgical procedures, according to *Merriam-Webster's Collegiate Dictionary* (10th ed.), at p. 1158.

(Medical Records, p. 6.) Anaglate prescribed three medications: Compazine [a medication used to control nausea and vomiting, according to the *Physician's Desk Reference*, 57th ed. (2003), at p. 1489], Imodium [a medication aimed at diarrhea and gastro-intestinal problems], and Raitin [which does not appear in the *PDR*], along with daily stoma care. (*Id.*, pp. 7-8, 53.) Although the doctor's notes are only semi-legible, the court can discern that he wrote, "∅ SOB" (no shortness of breath). (*Id.*, p. 5.)

After seeing the doctor, the plaintiff was transferred from Division 10 to the Residential Treatment Unit, or "Medical Dormitory." (Plaintiff's Deposition, pp. 18-19; Medical Records, pp. 6, 7.) On the plaintiff's medical dormitory admission form, Anaglate listed the plaintiff's medications and noted that he needed dressing changes for his tracheotomy tube. (Medical Records, p. 7.) The plaintiff remained in the medical dormitory until May 13, 2002, a week before he left the jail. (Plaintiff's Deposition, p. 18.)

When the plaintiff arrived at the jail, his throat was unclogged and he initially experienced "no problems" with the tracheotomy tube. (Plaintiff's Deposition, p. 21; Medical Records, p. 7.)

Although the plaintiff claims that the jail did not have a functioning mechanical suction pump (Plaintiff's Deposition, pp. 23-25), the health care staff did provide him with tracheotomy care kits like the ones he would obtain from the hospital prior to his incarceration. (*Id.*, pp. 24-26.) The plaintiff's medical records reflect that he received tracheotomy care daily, or nearly daily. (Defendants' Exhibit B, Treatment Dressing Records, pp. 41-47.) However, the plaintiff maintains that on certain occasions, he went up to ten days without a kit. (*Id.*, pp. 22, 24;

Plaintiff's Exhibit D, Affidavit of Ronald Myers, ¶ 2.)[2]   The nursing staff generally watched the

plaintiff clean his tracheotomy to make sure that he did it correctly.  (Plaintiff's Deposition, pp.

20, 23, 26.)

On August 9, 2001, the plaintiff filled out a Detainee Health Service Request form stating

that he needed to see a doctor because his tracheotomy tube did not "feel right."  (Defendants'

Exhibit B, p. 9.)  The plaintiff was referred to "sick call" the same day.  (*Id.*)

The plaintiff saw Dr. Ting for the first time on August 14, 2001.  (Defendants' Exhibit B,

Medical Records, p. 10.)  At that visit, the plaintiff complained of a weak suction machine.  (*Id.*,

p. 11.)  The plaintiff told Ting that he did not wish to change from his implanted tracheotomy

tube to a removable one that was attached as a "cuff with ties" because he feared risk of injury

from other inmates.  (*Id.*)  Ting prescribed the plaintiff Amoxicillin (an antibiotic), Tylenol and

Motrin.  (*Id.*, p. 53.)  Ting also referred the plaintiff to an ENT (ear, nose and throat) specialist.

(*Id.*, p. 10.)

The plaintiff saw an ENT specialist ten days later, on August 24, 2001.  (Plaintiff's

Deposition, p. 27.)  At the time of his first visit to the ENT specialist, the plaintiff was not

---

[2]For purposes of summary judgment, the court will accept as true the factual
representations the plaintiff makes in his sworn affidavit (unless in conflict with his deposition
testimony).  However, the plaintiff cannot now retract the statements he made during his
deposition.  A party may not create issues of credibility by contradicting his own earlier, sworn
testimony.  *See, e.g., Bank of Illinois v. Allied Signal Safety Restraint Systems*, 75 F.3d 1162,
1168-69 (7th Cir. 1996), *relying on Babrocky v. Jewel Food Co.*, 773 F.2d 857, 861 (7th Cir.
1985), *inter alia*.

Furthermore, the court has disregarded the plaintiff's references to medical records he
altered.  Indeed, although the plaintiff has explained in response to the defendants' motion to
strike that he did not intend to mislead the court, his submission of tampered medical records
could easily be construed as "fraud" upon the court, which must "lead to immediate termination
of the suit."  *Sloan v. Lesza*, 181 F.3d 857, 859 (7th Cir. 1999).

experiencing any throat problems. (*Id.*, p. 28.) Either the ENT doctor or the defendant Ting wrote the plaintiff prescriptions for tracheotomy care (saline irrigation) and a bedside humidifier. (Medical Records, p. 56.) The specialist recommended that the plaintiff return to Cermak in four weeks.

The plaintiff maintains that he began to experience problems swallowing and eating around the end of August 2001. (Plaintiff's Deposition, pp. 28-29.) On August 29, 2001, the plaintiff submitted a Detainee Health Service Request form indicating that he found a small amount of bright red blood when he cleaned out his tracheotomy tube. (Medical Records, p. 12.) The request slip did not mention any problems breathing or eating. (*Id.*) A nurse who spoke to the plaintiff noted that he had no breathing problems, that he was just concerned by the sight of blood. (*Id.*)

On September 17, 2001, the plaintiff was treated in the Cermak Emergency Room for a scalp laceration after he fell in the shower. (Medical Records, pp. 13-14.) The Ambulance Report Sheet attributed the fall to "no lights." (*Id.*, p. 13.) The medical records do not reflect any statement by the plaintiff to health care providers that he fell because he had lost consciousness due to an inability to breathe. (*Id.*, pp. 13-15.) The plaintiff received staples or sutures. (*Id.*, pp. 14-15.) The staples were removed on September 24, 2001, upon the plaintiff's request. (*Id.*, p. 16.)

On October 3, 2001, the plaintiff saw the defendant Altez at Cermak. (*Id.*, p. 17.) Altez wrote a prescription for the plaintiff to continue receiving routine tracheotomy care with suction for six weeks. (*Id.*, pp. 17, 56.) Carlos also referred the plaintiff to an ENT to evaluate the plaintiff's request for closure of his tracheotomy tube. (*Id.*, pp. 17-18.)

On October 21, 2001, the plaintiff filled out a health service request form complaining that he had not yet seen the ENT. (*Id.*, p. 19.) An appointment was scheduled for November 10, 2001. (*Id.*, p. 20.)

At the November 10, 2001, appointment, the ENT physician noted that the plaintiff's neck was "clean, no messes," that the tracheotomy tube was capped and in place, and that there were "no ulcers or messes." (*Id.*, p. 20.) The doctor additionally noted that the plaintiff "denied" shortness of breath. (*Id.*). The doctor directed that routine tracheotomy care be continued, and that he return to the ENT in four to six weeks. (*Id.*)

On November 13, 2001, the plaintiff saw the defendants Ting and Altez about his tracheotomy. (*Id.*, p. 21.) At that appointment, the plaintiff denied acute complaints, according to the medical progress notes. (*Id.*.) The plaintiff was directed to continue with the routine tracheotomy care and return to Cermak in two to three weeks. (*Id.*)

Ten days later, on November 23, 2001, the plaintiff saw an ENT doctor again.[3] At that time, the plaintiff reiterated that he wanted his tracheotomy tube removed. The physician recommended Ocean Nasal Spray for the plaintiff, directed him to continue the maintenance plan previously put in place, and scheduled an appointment for twelve weeks later. Ting wrote a prescription for nasal spray on the same day. (*Id.*, p. 57.)

Twelve days later, on December 4, 2001, the plaintiff returned to Cermak for a follow-up visit. (*Id.*, p. 22.) The defendant Mansour examined the plaintiff and charted that his stoma (trachcotomy tube) was clean, that there was no evidence of infection, and that the plaintiff's

---

[3]The court finds no medical records for November 21, 2001. However, the plaintiff does not contest the representations made by the defendants in this paragraph.

lungs were clear. (*Id.*) Mansour renewed the nasal spray prescription, recommended that the plaintiff continue with routine tracheotomy care, and scheduled a return appointment on January 29, 2002. (*Id.*, pp. 22, 57.)

On January 4, 2002, the plaintiff saw an ENT specialist again. (*Id.*, p. 25.) At that appointment, the plaintiff requested an appointment at the Cook County Hospital for routine cleaning. (*Id.*) The doctor indicated that he would refer the plaintiff to the hospital and scheduled a return appointment in eight weeks. (*Id.*)

On January 27, 2002, the plaintiff filled out a health service request form insisting that he needed to go to the hospital. (*Id.*, p. 23.) The plaintiff complained that he could not breathe, that his tracheotomy tube hurt when he cleaned it, and that the tube was blocked. (*Id.*) An appointment was scheduled for two days later. (*Id.*)

Dr. Mansour examined the plaintiff again on January 29, 2002. (*Id.*, p. 24.) Mansour noted the plaintiff's subjective complaints, but his objective observations were that the plaintiff's throat was clear and without lesions, that he demonstrated no shortness of breath, that he said he was not having problems breathing or talking, that the tube was in place, that there was no drainage, that the tube looked clear of mucus, and that there was "very good air exchange." (*Id.*) Mansour scheduled a follow-up appointment the following week and gave the plaintiff another prescription for Ocean Nasal Spray. (*Id.*)

At a doctor's visit on February 4, 2002, Mansour noted that the plaintiff had "∅ complaints @ present" and that he was scheduled at Cook County Hospital's Fantus Clinic four days later for a possible tube change. (*Id.*, p. 26.) Mansour ordered another prescription for nasal spray. (*Id.*)

9

On February 10, 2002, the plaintiff submitted another detainee health service request form. (*Id.*, p. 27.) The plaintiff stated, "I need to see the Doctor about my trach tube being cloggy & bleeding." (*Id.*) The defendant Altez noted on the form that an ENT had referred the plaintiff to Fantus Clinic and that the plaintiff was "waiting to go," but that the appointment had been postponed twice. (*Id.*) Altez further noted that the plaintiff nevertheless showed no signs of infection. (*Id.*)

The plaintiff was seen at Cermak's "sick call" on February 14, 2002, four days later. (*Id.*, pp. 28, 29.) Ting referred the plaintiff back to an ENT specialist. (*Id.*)

The next day, February 15, 2002, the plaintiff saw an ENT at the Cook County Hospital. (Plaintiff's Deposition, p. 61.) At that visit, the ENT replaced the plaintiff's tracheotomy tube. (*Id.*) Later that day, the plaintiff returned to Cermak Health Services and saw another ENT. (*Id.*, p. 63; Plaintiff's Medical Records, p. 28.) The Cermak ENT examined the plaintiff and recommended that he return in sixteen weeks. (Medical Records, p. 28.) Unspecified health care personnel also wrote the plaintiff a prescription for pain medication, although the plaintiff states that he never received it. (Plaintiff's Deposition, p. 63.)

Two or three days after his tube was replaced, the plaintiff saw the defendant Ting. (*Id.*, p. 65.) The plaintiff told the doctor he was still in pain. (*Id.*) Ting prescribed the plaintiff new medication. (*Id.*)

On February 20, 2002, the plaintiff filled out another detainee health service request form asking for pain medication. (Medical Records, p. 30.) A health care provider named Brown noted on the form the next day, "Detainee stated difficult to swallow, swollen, & painful. –A new trach put in [illegible]. B[lood] p[ressure] 132/76. Tylenol Suspension Liq. 30 cc." (*Id.*) A

"sick call" appointment was scheduled for March 12, 2002. (*Id.*) In addition, Dr. Ting prescribed Amoxicillin and Motrin to combat pain and infection. (Medical Records, p. 61.)

On February 24, 2002, the plaintiff filled out another detainee health service request form, complaining of persisting pain. (*Id.*, p. 31.) A licensed practical nurse who spoke to the plaintiff noted on the form that the plaintiff was claiming throat and neck pain and insisting that the pain was not relieved by Tylenol. (*Id.*)

On March 4, 2002, the plaintiff filled out another request form asking to see a doctor. (*Id.*, p. 32.) The plaintiff wrote, "You put me on pain medicine and now it stop[ped]. I need to see you doctor about this and the other medicine stop." (*Id.*) The plaintiff was referred to sick call the same day. (*Id.*)

On March 12, 2002, the plaintiff had an appointment with the defendant Mansour. (*Id.*, p. 33.) Mansour's notes concerning the examination indicated that the plaintiff "feels much better," that his breathing was better, that his vital signs were "OK," that his tracheotomy bore no evidence of infection, that the tracheotomy tube was in place, and that his lungs were clear. (*Id.*) Mansour prescribed the plaintiff Tylenol and Disalcid [a non-steroid anti-inflammatory drug also used for pain]. (*Id.*, p. 63.)

On March 20, 2002, the plaintiff saw Dr. Ting again. (*Id.*, p. 34.) Ting noted on the plaintiff's medical progress notes that he complained of difficulty swallowing for about a month, but that there were no objective signs of a problem. (*Id.*) The plaintiff had no difficulty talking or breathing, his neck was supple, and the tracheotomy tube was clean and without blockage or obstructions. (*Id.*) Because the plaintiff complained that the Amoxicillin caused gastro-intestinal problems, Ting prescribed three new medications: Motrin, Naprosyn (another non-steroidal anti-

inflammatory pain medication), and Taguire. (*Id.*, p. 63.) [Neither party explains what Taguire is used for and the drug is not listed in the *Physician's Desk Reference*.] Ting referred the plaintiff to an ENT two days later and directed that he return to Cermak in four to six weeks. (*Id.*, p. 34.)

On March 22, 2002, an ENT specialist examined the plaintiff. (*Id.*, p. 35.) The ENT noted that the plaintiff's mouth was pink and moist and without lesions, and that his neck was soft and supple. (*Id.*) The ENT directed that the plaintiff return in two weeks. (*Id.*)

On March 27, 2002, the plaintiff was prescribed Ibuprofen and Prevacid (a medication used to relieve heartburn, acid reflux and ulcers). (*Id.*, p. 62.)

On April 19, 2002, an unnamed physician referred the plaintiff back to an ENT specialist for a follow-up appointment. (*Id.*, p. 36.) The plaintiff saw the ENT the next day, April 20, 2002. (*Id.*) Although the ENT's notes are illegible, the consultation form shows that the plaintiff was to return in six weeks. (*Id.*)

On April 30, 2002, the plaintiff saw the defendant Ting at "sick call." (*Id.*, p. 37.) Among other [mostly illegible] notes, Ting charted that the plaintiff's neck was supple, that he demonstrated no trouble breathing and no shortness of breath, and that the tracheotomy tube looked clean. (*Id.*) At the same appointment, Ting prescribed the plaintiff Motrin, Prevacid, and Elavil (a drug used to treat depression and migraine headaches, as well as to manage chronic pain). (*Id.*, p. 63.) Ting prescribed Elavil because the plaintiff told him that Naprosyn was not easing his pain. (Plaintiff's deposition, pp. 39, 41.) Each time the plaintiff saw Dr. Ting and complained that the current pain medication was not alleviating his pain, Ting would prescribe a different drug. (*Id.*, p. 48.)

On May 8, 2002, the plaintiff was evaluated for a transfer to 3 North (a hospital unit).

(Medical Records, p. 39.) The doctor noted:

> Patient states doing well, not having problems č tracheostomy tube; getting
> tracheostomy care when needed; states he's very comfortable and happy č
> TRACHEOSTOMY care in RU Medical Area. States his tube has been changed
> and he's [illegible]. Denies shortness of breath, clogging of tube or problems
> breathing, also denies GERD symptoms. Pt has been seen by ENT doctors = 7x at
> Cermak being the last visit on 5/3/02. Also seen by ENT doctors at Cook County
> hospital about 4 or 5 times; and seen in sick call visits several times without any
> complaints of life threatening situations. Pt stable without any acute complaints
> and refuses to be transferred to 3 North hospital area. Refusal form signed by
> patient after patient was clearly explained about refusal implications. Pt also is a
> worker and has been working for over 4 months in RU Medical Area in the
> Clothing Department. Continue with tracheostomy care. Follow-up with ENT as
> advised. RTC as advised by Dr. Ting. (*Id.*)

At a second visit to the health care unit that day, the doctor noted on the plaintiff's

medical progress chart:

> No complaints; said he feels fine. . . . He said he is happy with the tracheotomy
> care he is [illegible]. He said he is getting suction, [illegible], clean of
> tracheotomy hole daily. He said the nurse always gives him the cleaning kit and
> suction. When ever he wants. He said he has no problem with his tracheotomy
> care [illegible]. ⊘ shortness of breath ⊘ fever ⊘ obstruction. He feel (sic) fine.
> Alert [illegible], neck supple, [illegible] tracheotomy tube. [Illegible] clean. No
> obstructions. . . . (*Id.*, p. 40.)

The plaintiff signed a form confirming that he had refused placement on 3N/3W hospital

wing for routine tracheotomy care.[4]  (*Id.*, p. 41.)  Five days later, the plaintiff was transferred to

another unit. (Defendants' Exhibit C, Housing History, p. 2.) The plaintiff left the jail on May

20, 2002, a week later. (Plaintiff's Deposition, p. 8.)

---

[4] The medical progress notes reporting that the plaintiff was completely satisfied with his
tracheostomy care just weeks after he filed suit may be taken with a grain of salt. However, the
plaintiff cannot deny that he declined placement in the hospital wing since the signed refusal form
is in the record.

## DISCUSSION

Even viewing the record in the light most favorable to the plaintiff, no reasonable person could find that the defendants acted with deliberate to the plaintiff's serious medical needs. The record establishes that the plaintiff received comprehensive medical care, even if he was unsatisfied with it. The plaintiff's evidence, consisting of unsupported statements and contradictory sworn testimony, is insufficient to create a triable issue of fact. The plaintiff has failed to meet his burden under Fed. R. Civ. P. 56 for the case to survive summary judgment.

The court recognizes that, in ruling on a motion for summary judgment, the court cannot weigh the affidavits or the credibility of the parties. *Castillo v. United States*, 34 F.3d 443, 445 (7th Cir. 1994). Nevertheless, "there is no issue for trial unless there is sufficient evidence favoring the nonmoving party for a jury to return a verdict for that party. If the evidence is merely colorable, or is not significantly probative, summary judgment may be granted." *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 249-50 (1986) (citations omitted). The inquiry is essentially "whether the evidence presents a sufficient disagreement to require submission to the jury, or whether it is so one-sided that one party must prevail as a matter of law." *Id.* at 251-52. In this case, the evidence almost entirely refutes the plaintiff's allegations.

It is well established that the Due Process Clause prohibits deliberate indifference to the serious medical needs of a pretrial detainee. *Qian v. Kautz*, 168 F.3d 949, 955 (7th Cir. 1999); *Salazar v. City of Chicago*, 940 F.2d 233, 237-38 (7th Cir. 1991). Deliberate indifference has both an objective and a subjective element: the inmate must have an objectively serious medical condition, and the health care provider must be subjectively aware of and consciously disregard a risk to the inmate's health or safety. *Farmer v. Brennan*, 511 U.S. 825, 837 (1994); *Estelle v.*

*Gamble*, 429 U.S. 97, 103-04 (1976); *Sherrod v. Lingle*, 223 F.3d 605, 610 (7th Cir. 2000). In this case, the court will assume for purposes of this motion that tracheotomy maintenance is a "serious" medical need; however, the plaintiff has failed to make a triable showing that the defendants acted with deliberate indifference.

In denying the defendants' motion to dismiss, the court noted that the fact that a prisoner received **some** medical attention does not necessarily defeat his Section 1983 claim; deliberate indifference to a serious medical need can be manifested by "woefully inadequate action" as well as by no action at all. *Reed v. McBride*, 178 F.3d 849, 854 (7th Cir. 1999). But the more fully developed record demonstrates that the plaintiff received constitutionally adequate medical treatment. At best, the plaintiff has greatly exaggerated both his medical complaints and any deficiencies in the care he received; at worst, this is an entirely trumped-up lawsuit.

## No Serious Health Complication

Even though the plaintiff's tracheotomy or tracheostomy pre-dated his incarceration by almost two years, the court finds that he had a "serious" medical condition. Under the Seventh Circuit's standard,

> A "serious" medical need is one that has been diagnosed by a physician as mandating treatment or one that is so obvious that even a lay person would easily recognize the necessity for a doctor's attention. . . . [Indications of a serious medical need include] the existence of an injury that a reasonable doctor or patient would find important and worthy of comment or treatment; the presence of a medical condition that significantly affects an individual's daily activities; or the existence of chronic and substantial pain.

*See Gutierrez v. Peters*, 111 F.3d 1364, 1373 (7th Cir. 1997). Even though the plaintiff's medical records repeatedly refer to "routine maintenance," the importance of a breathing tube is obvious; its proper functioning would constitute an objectively serious medical need. In fact, the medical

staff deemed monitoring of the plaintiff's condition sufficiently important to house him in the residential treatment unit. The court therefore finds that the plaintiff's medical needs were "serious."

Nevertheless, the record fails to support the plaintiff's claim that he had serious complications during his incarceration at the jail. In his complaint, the plaintiff alleged that he endured agonizing pain, fainting, a great deal of bleeding, a diminished ability to eat and drink, and so much difficulty breathing that fellow inmates literally had to squeeze the air out of him on occasion. The medical records in no way substantiate those claims. To the contrary, the record indicates that the plaintiff suffered from relatively minor, chronic problems one might expect from having a tracheotomy tube in one's throat.

Multiple facts lead the court to the inescapable conclusion that the plaintiff's medical problems did not rise to the level of severity contemplated by *Estelle* and its progeny. First, the plaintiff's "Treatment/Dressing Record," taken in the normal course of business, document tracheotomy care performed nearly every single day of the plaintiff's incarceration, from February 10, 2002, through July 31, 2001, through March 11, 2002. *See* Defendants' Exhibit B, Plaintiff's Medical Records, pp. 42-48. [Presumably, a page is missing from the record covering the plaintiff's last two months at the jail.]

Despite the daily Treatment/Dressing Records, the plaintiff insists that he sometimes went up to ten days without cleanings. But even if there were occasional missed dates, the routine care must have kept the plaintiff's tracheotomy tube reasonably clean, as the nurses' notes reflect no problems. To the contrary, while some of the plaintiff's health request slips described pain and breathing problems, none of the health care providers with whom he came into contact observed

any objective symptoms. Every single medical entry–by the named defendants, by non-defendant jail physicians, and by ENT specialists at both Cermak and the Cook County Hospital–states that the plaintiff's tracheotomy tube was clear and free of obstruction, that the plaintiff evidenced no difficulty breathing, and that there were no lesions or signs of infection.

The notes of both the general practitioners and specialists directed that the plaintiff continue with the "routine" maintenance plan and invariably directed that he return anywhere from four to eight weeks later for follow-up appointments; plainly, no one thought his health situation necessitated close supervision. The plaintiff's medical records make no mention of his ever communicating to the health care staff that he was fainting, unable to eat or drink, or relying on fellow inmates to squeeze the air out of him. The plaintiff's charts reflect no concerns whatsoever about major problems or complications.

The plaintiff did twice complain of bleeding, but occasional, minimal bleeding appears to be completely run-of-the-mill, just as with dental flossing. The first time, the sight of blood only made the plaintiff worry; he was not experiencing pain or other problems. *See* Defendants' Exhibit B, Medical Records, p. 12.) The second time, the defendant Altez examined the plaintiff but found no signs of infection. (*Id.*, p. 27.) The plaintiff has provided no medical evidence that he had any "serious" health problems associated with his tracheotomy tube.

**No Deliberate Indifference**

Even assuming (without finding) that the plaintiff did have any tracheotomy-related problems serious enough to implicate constitutional concerns, the record does not support a finding that the defendants acted with deliberate indifference to his condition. The plaintiff's medical records reflect a comprehensive maintenance plan, which included his placement in the

17

hospital residential unit for closer observation than the plaintiff would have received had he been housed in general population, daily [or nearly] daily cleanings supervised by the nursing staff, numerous visits to the staff physicians, and frequent examinations by on-site and off-site ENT specialists. The plaintiff was provided with kits for tracheotomy care, and multiple medications were prescribed for antibiotic treatment and for pain. The doctors' notes uniformly reflect that care was "routine," and that the plaintiff was doing reasonably well for someone with a breathing tube inserted in his neck.

It is not surprising that the plaintiff sometimes experienced pain, particularly after surgery to replace the tracheotomy tube. Certainly, prolonged and severe pain can amount to a serious medical need, *Walker v. Benjamin*, 293 F.3d 1030, 1039-40 (7th Cir. 2002), and the subjective element of deliberate indifference encompasses conduct such as the refusal to treat a prisoner's chronic pain. *Jones v. Simek*, 193 F.3d 485 (7th Cir. 1999). However, not every "ache and pain or medically recognized condition involving some discomfort can support an Eighth Amendment claim." *Gutierrez v. Peters*, 111 F.3d 1364, 1370-72 (7th Cir. 1997). In this case, the record establishes that the defendants made reasonable efforts to minimize any pain the plaintiff was experiencing.

The plaintiff has made inconsistent statements concerning the treatment of his pain. During the course of this case, the plaintiff has alternately stated that he received only over-the-counter Tylenol, that he never received prescribed pain medication, and that the pain medication he received was entirely ineffective. But as noted in footnote 2, a party may not create issues of credibility or fact by contradicting his own sworn testimony. *See also Ilhardt v. Sara Lee Corp.*, 118 F.3d 1151, 1152 n. 1 (7th Cir. 1997); *Eckert v. Kemper Financial Services, Inc.*, No. 95 C

18

6831, 1998 WL 699656, *5 (N.D. Ill. September 30, 1998) (Williams, J.), *inter alia*. If a party is allowed to create a genuine issue of material fact by changing his prior testimony, "the very purpose of the summary judgment motion--to weed out unfounded claims, specious denials, and sham defenses--would be severely undercut." *Babrocky*, 773 F.2d at 861. Contradictory testimony will not defeat summary judgment.

In his deposition, the plaintiff admitted that he did receive pain medication and that Dr. Ting would prescribe a different pain medication every time the plaintiff complained that the current drug was not alleviating his pain. *See* Plaintiff's deposition, p. 48. That fact is substantiated by the plaintiff's voluminous medical records, which reflect orders for various pain medications. The defendants' failure to assuage the pain altogether does not rise to the level of deliberate indifference. Where, as here, a physician provides constitutionally acceptable care, his or her inability to effect a final cure is not proof of deliberate indifference. *Snipes v. DeTella*, 95 F.3d 586, 591 (7th Cir. 1996), *cert. denied*, 519 U.S. 1126 (1997). The defendants were not deliberately indifferent to any pain the plaintiff endured as a result of having a breathing tube.

The record does not conclusively establish whether the plaintiff generally had access to a properly functioning suction machine while he was incarcerated at the jail. Again, some of the confusion is caused by the plaintiff's own, varying representations: he has alternately claimed that the suctioning machine had a weak vacuum pull, that it did not work at all, and that it was non-existent. But in any event, the court may grant summary judgment if facts are in dispute, so long as those facts are not outcome determinative. *Matter of Wildman*, 859 F.2d 553, 556 (7th Cir. 1988); *Nash v. DeTella*, No. 00 C 2784, 2001 WL 1160840, *2 n. 5 (N.D. Ill. Oct. 2, 2001) (Zagel, J.) In this case, irrespective of whether the plaintiff had the use of a properly working

19

suction pump, there is no genuine dispute that he had regular use of the cleaning tools of a tracheotomy kit, and that doctors never noted any obstructions or infection whenever they examined his breathing tube. The plaintiff's claim that the tube often became clogged is entirely unsubstantiated by his medical records.

The medical staff addressed the plaintiff's concerns whenever he submitted a medical request slip complaining of a medical problem. Moreover, each of the defendants, as well as the ENT specialists at Cermak and at the Cook County Hospital, administered the same basic treatment plan. The fact that all of the plaintiff's treating physicians largely agreed on the care of his tracheotomy tube bolsters the conclusion that the defendants were not deliberately indifferent. *See Steele v. Choi*, 82 F.3d 175, 178-79 (7th Cir.), *cert. denied*, 519 U.S. 897 (1996); *see also Estate of Cole by Pardue v. Fromm*, 94 F.3d 254, 262 (7th Cir. 1996), *cert. denied*, 519 U.S. 1109 (1997) ("liability may be imposed only when the decision by the professional is such a substantial departure from accepted professional judgment, practice, or standards as to demonstrate that the person responsible did not base the decision on such a judgment").

In *Steele*, a prison physician diagnosed an inmate as suffering from a drug overdose and treated him accordingly. Doctors at an outside hospital reached the same conclusion; only after the inmate's condition deteriorated did health care professionals realize that the inmate was experiencing a brain hemorrhage. The Court of Appeals affirmed the entry of summary judgment in favor of the prison doctor, finding that "[i]f two sets of outside doctors could draw the same (erroneous) conclusion [about the nature and seriousness of the plaintiff's condition], it is difficult at best to claim that another diagnosis was 'obvious.'" *Steele*, 82 F.3d at 178. Here, as in *Steele*, other physicians made the same assessment, that the plaintiff was doing well;

defendants and non-defendants alike also provided essentially the same, standard maintenance plan for the plaintiff's tracheotomy tube, belying any inference that the defendants' approach was blatantly inappropriate.

Although the plaintiff may have been dissatisfied with the caliber and efficacy of his overall care, the defendants' treatment did not violate the Constitution. Mere disagreement with a doctor's prescribed course of treatment does not implicate the Fourteenth Amendment. *Snipes v. DeTella*, 95 F.3d 586, 592 (7th Cir. 1996), *cert. denied*, 519 U.S. 1126 (1997). Additionally, evidence that some medical professionals would have chosen a different course of treatment–evidence the plaintiff has not even provided in this case–might establish negligence, but is insufficient to make out a constitutional claim. *Collignon v. Milwaukee County*, 163 F.3d 982, 989 (7th Cir. 1998), *relying on Steele*, 82 F.3d at 179. The Constitution is not a vehicle for bringing claims for medical malpractice. *Bryant v. Madigan*, 84 F.3d 246, 249 (7th Cir. 1996).

It is not even entirely clear what better or different treatment the plaintiff wanted. Regardless, the question of whether a certain diagnostic technique or form of treatment should be prescribed "is a classic example of a matter for medical judgment." *Estelle v. Gamble*, 429 U.S. 97, 107 (1976). A prisoner does not have a right to a particular type of medical treatment. *Meriwether v. Faulkner*, 821 F.2d 408, 413 (7th Cir. 1987). A plaintiff can show that the professional disregarded a serious medical need "only if the professional's subjective response was so inadequate that it demonstrated an absence of professional judgment, that is, that no minimally competent professional would have so responded under those circumstances." *Collignon*, 163 F.3d at 989. The plaintiff has not met his burden of production.

21

Any brief delays in receiving medical attention are not actionable under 42 U.S.C. § 1983 under the facts of this case. Where a plaintiff alleges a constitutional violation based on a delay of medical treatment, "the relevant question is whether the delay in access to treatment was so unreasonable under the circumstances as to suggest deliberate indifference." *Brown v. Briick*, 92 C 2094, 1995 WL 263488, *7 (N.D. Ill. May 3, 1995) (Nordberg, J.) The plaintiff complains that he spent one night in the segregation unit before being transferred to the medical unit, but as discussed above, the plaintiff had no serious condition that warranted hospitalization; his treating physicians placed him in the residential treatment unit only because his tracheotomy tube required regular, ongoing maintenance. In fact, the plaintiff eventually chose not to reside in the treatment unit and was moved to the general population, contrary to the defendants' recommendation.

Furthermore, the replacement of the plaintiff's tracheotomy tube was apparently entirely elective; it is undisputed that the plaintiff himself declined to have the stoma replaced for some time before he eventually decided he wanted a removable tube. *See* Defendants' Exhibit B, Medical Records, p. 11. Because replacement of the plaintiff's tracheotomy tube was not critical, he is not entitled to damages for having to wait for the procedure. Where, as here, the plaintiff's medical complaints were of a non-emergency nature, the short delays in providing treatment did not amount to deliberate indifference. *See, e.g., Gutierrez v. Peters*, 111 F.3d at 1374; *Lucien v. Godinez*, 814 F. Supp. 754, 755 (N.D. Ill. 1993). A plaintiff who complains that a "delay in medical treatment rose to a constitutional violation must place **verifying medical evidence** in the record to establish the detrimental effect of delay in medical treatment to succeed." *Langston v.*

*Peters*, 100 F.3d 1235, 1240 (7th Cir. 1996) (emphasis in original), *quoting Beyerbach v. Sears*, 49 F.3d 1324, 1326 (8th Cir. 1995).

In sum, the medical care provided by the defendants was not so erroneous or so woefully inadequate as to amount to an essential denial of medical care. *Reed v. McBride*, 178 F.3d 849, 854 (7th Cir. 1999). Although the plaintiff alleges that he suffered dire problems stemming from his tracheotomy tube, his medical records do not reflect that he communicated most of the worst of his alleged concerns to the medical staff. As to those problems that he did voice, the medical staff found no objective signs of problems or infections to substantiate the plaintiff's concerns. The plaintiff has provided no medical records and no witnesses to support his claims.

## Conclusion

Even drawing every reasonable inference in favor of the plaintiff, the court finds that the defendants have established that they are entitled to judgment as a matter of law. The record shows that the plaintiff had no serious medical need, apart from routine maintenance of his tracheotomy tube, and that, in any case, the defendants did not act with deliberate indifference. The plaintiff has failed to cite any independent evidence in support of his claims that he had serious health complications, that he did not receive routine stoma care, or that he was otherwise denied needed medical attention. The vast weight of the evidence supports the defendants' position; the court finds that no reasonable person could conclude that the defendants acted with deliberate indifference to the plaintiff's serious medical needs. Consequently, the defendants' motion for summary judgment must be granted.

For the foregoing reasons, the case is terminated. If the plaintiff wishes to appeal this final judgment, he must file a notice of appeal with this court within thirty days of the entry of

23

judgment. Fed. R. App. P. 4(a)(4). A motion for leave to appeal *in forma pauperis* should set forth the issues the plaintiff plans to present on appeal. *See* Fed. R. App. P. 24(a)(1)(C); *Hyche v. Christensen*, 170 F.3d 769, 771 (7th Cir. 1999). If the plaintiff does choose to appeal, he will be liable for the $105 appellate filing fee irrespective of the outcome of the appeal. *Evans v. Illinois Dept. of Corrections*, 150 F.3d 810, 812 (7th Cir. 1998). Furthermore, if the appeal is found to be non-meritorious, the plaintiff may also accumulate a "strike" for purposes of 28 U.S.C. § 1915(g). The plaintiff is warned that if a prisoner has had a total of three federal cases or appeals dismissed as frivolous, malicious, or failing to state a claim, he may not file suit in federal court without prepaying the filing fee unless he is in imminent danger of serious physical injury.

IT IS THEREFORE ORDERED that the defendants' motion for summary judgment (docket #52) is granted. The clerk of the court is directed to enter judgment in favor of the defendants pursuant to Fed. R. Civ. P. 56. The case is terminated. The parties are to bear their own costs.

Enter:

_____

David H. Coar
United States District Judge

Date: _____ a / 11 / 03 _____